## LAKA TOOL AND STAMPING CO., INC.

v.

## The UNITED STATES.

No. 425–78.

United States Court of Claims.

Dec. 17, 1980.

commercially impracticable of performance. We hold that the board's decision should be affirmed in part and reversed in part, and remand for further proceedings at the administrative level.

The pertinent facts as found by the board are that on March 11, 1975, the U.S. Army Armament Command issued a request for proposals for the procurement of 752,900 30-round magazines for the M16/M16A1 rifle. The end-item magazine assembly consists of four pieces: an open-ended aluminum box, a plate which slips into the bottom of the box, a spring, and a molded nylon "follower" which pushes the bullets out through an aperture at the top of the box. The proposed firm, fixed-price contract was a set-aside for small business. Plaintiff was the low bidder and a pre-award survey was conducted of plaintiff's facilities. Since plaintiff's bid was much lower than the others received, plaintiff was contacted to see if it had made a mistake in its bid. It later appeared that a mistake had been made, regarding the required thickness of aluminum, but that mistake is not in issue in this case. Plaintiff waived in writing any claim, based on a mistake in bid, prior to contract award. Plaintiff was awarded the contract, No. DAAA09–75–C–2051, on June 4, 1975. The contract included a standard clause, entitled First Article Approval—Contractor Testing, which required government approval of first article samples before beginning full production, and another clause, entitled Progress Payment for Small Business Concerns, which allowed progress payments at 85 percent of costs.

Plaintiff's previous experience was largely as a tool and die designer and manufacturer and machine designer for commercial enterprises, such as a zipper manufacturer, men's jewelry manufacturer, and a manufacturer of watch cases. Plaintiff had never before manufactured magazines for the M16 rifle. It did have a contract for the 45-caliber pistol magazine but experience under that contract had little applicability to the M16 contract.

Eugene Schaffel, New York City, attorney of record, for plaintiff. Buckley, Treacy, Schaffel, Mackey & Abbate, New York City, of counsel.

Cynthia C. Cummings, Washington, D. C., with whom was Asst. Atty. Gen. Alice Daniel, Washington, D. C., for defendant.

Before COWEN, Senior Judge, and KASHIWA and BENNETT, Judges.

## ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

BENNETT, Judge.

This government contract case is before the court for Wunderlich Act review of a decision, adverse to plaintiff, by the Armed Services Board of Contract Appeals (the board) on April 28, 1978. *Laka Tool & Stamping Co.*, ASBCA No. 21338, 78–1 BCA ¶ 13,207. The trial judge on consideration of motions for summary judgment recommended that the board decision be reversed and defendant now requests review of the trial judge's recommended decision. Plaintiff, of course, supports the trial judge's opinion. The basic issue is whether plaintiff is entitled to have the default termination of its contract converted to one for the convenience of the Government or is otherwise entitled to recover on the ground that the contract or part of it was impossible or

Plaintiff commenced work on its first articles and on March 2, 1976, government representatives visited plaintiff's plant for first article inspection. The inspection was terminated due to plaintiff's failure to complete the required test reports. At that point, the government representatives for the first time informed plaintiff that they regarded an .883-width dimension of the magazine box to impose a flatness requirement also over the magazine's entire 7-inch length. On March 25, 1976, the government quality assurance representative inspected samples of plaintiff's first articles and found that they did not conform to the .883 dimension.

A meeting was held between the parties on March 30, 1976. A number of items were discussed, including the flatness requirement. Plaintiff took the position that the .883 dimension was simply a width requirement rather than a width and flatness requirement as the Government viewed it. After discussion, the government representatives agreed that the flatness requirement could be modified to apply only to the top 2½ inches of the magazine, the portion actually inserted into the rifle. Plaintiff was asked whether that would be an acceptable compromise. Eugene Laka, son of plaintiff's president, John Laka, then wrote a draft agreement which was reviewed by the Government and signed by the parties. This Memorandum of Agreement, dated March 30, 1976, provided as follows:

Subject: Contract DAAA09–75–C–2051

Anything in subject contract, drawings, specifications or other documents referenced in said contract notwithstanding, the parties agree that the flatness tolerance of .883 ± .005 of the box magazine, shall be inspected for conformance and acceptability exclusively across that portion of the magazine which enters into the receiving gage. This agreement will in no way affect contract price or delivery schedule.

This agreement was signed for plaintiff by John Laka on the advice of his son and his attorney.

Plaintiff continued to work under the modified contract but was unable to comply with even the modified flatness requirement. It came to the conclusion that compliance with the .883 flatness requirement was impossible. Plaintiff therefore forwarded a claim to the contracting officer based on the flatness requirement along with other claims not now relevant. Plaintiff contended that the Government's insistence on the flatness requirement was an abuse of authority and inconsistent with the drawings and specifications. The contracting officer denied the claims on June 1, 1976, and plaintiff timely appealed the decision.

Plaintiff continued work on the contract but was never able to produce magazines conforming to the 2½-inch flatness requirement. Nevertheless, the Government continued to make progress payments. On July 23, 1976, a government representative visited plaintiff's plant and found that all production had ceased because of lack of funds and inability to meet the flatness requirement. On July 26, 1976, plaintiff was given a 10-day cure notice. Plaintiff replied on August 5, 1976, that its magazines met contract requirements, that the Government had interfered with production and made the contract impossible of performance, that specifications and drawings were defective, and that the contract had become economically impracticable to perform. The contract was terminated for default on August 18, 1976, based on failure to deliver and abandonment. By that time, plaintiff had expended $395,520 in production efforts and had received $288,606 in progress payments. Plaintiff appealed the termination to the board. The appeal was consolidated with plaintiff's earlier appeal and all claims were tried together.

The basic issue before us is whether the contract, even as modified to include the 2½-inch flatness requirement, was impossible or commercially impracticable of performance. Defendant asserts that the 2½-inch flatness requirement was possible and practicable to achieve. It argues, further, that any claims arising before March 30, 1976, are barred by the parties' agreement on

that date. Defendant also counterclaims for the total amount of progress payments made since no acceptable magazines were ever received under the contract.

The board denied plaintiff's claims in their entirety. We deal here only with those portions of the board's opinion which are still relevant. The board found that the flatness requirement over the entire 7-inch length of the magazine was impossible of performance. This conclusion was based on findings that two other producers of the magazine, Adventure Line and Okay Industries, had also failed to satisfy the 7-inch flatness requirement. The board, therefore, felt that a termination for default based on failure to comply with such a requirement would have been improper. However, it held that the mutual agreement reached by the parties on March 30, 1976, was an accord and satisfaction compromising what had previously been a dispute over whether flatness was required by the contract at all. The board does not seem to have considered the effect of the March 30 agreement on possible claims based on the impossibility of complying with the 7-inch flatness requirement. The board does mention at one point that at the time the parties entered into the March 30 agreement, there were no discussions regarding a reservation on plaintiff's part to claim an equitable adjustment as to contract price. *Laka Tool & Stamping Co., supra,* 78–1 BCA at 64,616. However, it appears that the board was referring to reservations as to possible future claims based on contract performance *after* the March 30 agreement. 78–1 BCA at 64,624.

The board further found that the contract as modified to require flatness over the top 2½ inches of the magazine was not impossible of performance since it had been achieved by another contractor, Okay Industries. Okay, unlike plaintiff, had considerable experience in producing the 30-round magazine. The board found that extremely careful monitoring of production and a special production technique were critical to Okay's success. Okay also had a much greater investment in its tooling than did plaintiff. Okay used progressive dies costing about $240,000 and a 200-ton press costing $150,000–$180,000. Plaintiff only had a 32-ton press costing $16,000. The board speculated that given the great cost of Okay's tooling, it may have been commercially impracticable for plaintiff to achieve even the 2½-inch flatness requirement. However, it found that the record failed to establish that use of such expensive tooling was necessary for plaintiff to have performed successfully under its contract. The board did not reach the question of commercial impracticability because it held that in any event plaintiff had assumed the risk of impossibility or impracticability in the March 30 agreement. Therefore, the board held the termination for default was proper.

The trial judge disagreed with the board. He concluded that the March 30 agreement was not an accord and satisfaction. The trial judge also concluded that the contract even as modified was commercially impracticable in a "subjective" sense. By "subjective" commercial impracticability we refer to impracticability which is due to the inability of the particular promisor as opposed to "objective" commercial impracticability which arises from the nature of the promised performance itself. *Jennie-O Foods, Inc. v. United States,* 217 Ct.Cl. 314, 328–29, 580 F.2d 400, 409 (1978); Restatement of Contracts § 455 (1932). The trial judge found that even though Okay Industries had been able to produce magazines conforming to the 2½-inch flatness requirement, *plaintiff* could not have done so without expenditures so extreme as to be commercially senseless and beyond plaintiff's reasonable capacity. The trial judge, therefore, concluded that the default termination should be converted to a termination for convenience.

■ We reach a different result. We consider first plaintiff's claim that the default termination was improper because the contract was impossible of performance or commercially impracticable even after it was modified to require flatness only over the top 2½ inches of the magazine. The

claim of impossibility cannot stand since the board found that Okay Industries was able to satisfy the 2½-inch flatness requirement and the trial judge found that the conclusion of the board should not be disturbed. Since plaintiff has not challenged any part of the trial judge's recommended decision, that finding must be upheld. Furthermore, since Okay Industries was able to produce the magazines, and since there has been no showing that Okay's production was commercially senseless, plaintiff's claim of commercial impracticability must also fail, at least in the objective sense. *Jennie-O Foods, Inc. v. United States, supra,* 217 Ct.Cl. at 328–29, 580 F.2d at 409; *Natus Corp. v. United States,* 178 Ct.Cl. 1, 9, 371 F.2d 450, 456 (1967).

The trial judge, as we noted, found that conformance to the 2½-inch flatness requirement was commercially impracticable in a subjective sense, *i. e.,* for plaintiff, not for everyone. We need not reach the question of whether subjective commercial impracticability can ever form the basis for relief, because, as we will show, it has not been demonstrated in this case. The trial judge based his conclusion of subjective commercial impracticability on the great cost difference between the tooling used by Okay Industries and that used by plaintiff and the fact that plaintiff was a small business with limited financial resources. To reach his conclusion, the trial judge must have implicitly found that Okay's additional tooling was necessary to perform plaintiff's contract. However, one critical, contrary finding of fact by the board stands in the way of such a conclusion. It states: "The record does not establish that success for [plaintiff] depended necessarily upon acquisition of additional tooling as expensive as that possessed by Okay." *Laka Tool & Stamping Co., supra,* 78–1 BCA at 64,624. Our power to make findings of fact contrary to the board's is limited by the provisions of the Wunderlich Act, 41 U.S.C. § 321 (1976). To do so, we must conclude that the particular finding of fact is fraudulent, capricious or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence. Fur-

thermore, where the evidence is disputed, to make a contrary finding we must also find that the overwhelming weight of the evidence strongly points to one conclusion of fact. *Koppers Co. v. United States,* 186 Ct.Cl. 142, 147, 150, 405 F.2d 554, 557, 559 (1968). The trial judge does not indicate that the board's finding is unsupported by substantial evidence or otherwise fails under Wunderlich Act requirements and plaintiff has also failed to demonstrate such error. In addition, there has certainly been no showing by either the trial judge or by plaintiff before us that the overwhelming weight of the evidence strongly points to one conclusion of fact, *i. e.,* that Okay's expensive tooling was necessary for plaintiff to have successfully performed under the contract. Hence, we must hold that plaintiff has not proven that the modified contract was even commercially impracticable subjectively, and we reverse the trial judge's holding on this issue. It follows that the default termination was proper.

■ Plaintiff's case is stronger as to its claim for premodification costs incurred in attempting to comply with the 7-inch flatness requirement. The board found that requirement was impossible to achieve and that plaintiff had not assumed the risk of the impossibility of that specification. Defendant does not now challenge these conclusions. Where a contractor has not assumed the risk of an impossible government-drafted design specification, a claim arises for an equitable adjustment to cover the costs the contractor has expended in attempting to perform in accordance with such specification. *Foster Wheeler Corp. v. United States,* 206 Ct.Cl. 533, 513 F.2d 588 (1975); *Hol-Gar Mfg. Corp. v. United States,* 175 Ct.Cl. 518, 360 F.2d 634 (1966). The Government's position is based on two affirmative defenses: (1) that the March 30 agreement was an accord and satisfaction barring the present claim and (2) that plaintiff waived this claim.

■ The board held that the March 30 agreement was an accord and satisfaction. The trial judge held that it was not. The

confusion stems from the presence of more than one claim. The board was concerned only with the parties' dispute over the proper interpretation of the contract. Plaintiff had contended that the .883 dimension imposed no flatness requirement. The Government insisted that it imposed a 7-inch flatness requirement. The March 30 agreement compromised both of those disputed claims. The board properly held, therefore, that the agreement was an accord and satisfaction, and as such it bars any later argument by either party that its previous interpretation of the contract was correct and should govern contract performance. 6 Corbin §§ 1276, 1288 (1962). The trial judge was not dealing with the contract interpretation dispute. Instead, he was considering the present claim, i. e., whether plaintiff was entitled to an equitable adjustment for costs expended prior to the March 30 agreement in an attempt to comply with the impossible 7-inch flatness requirement. The issue before the trial judge was whether this present claim was barred by the March 30 agreement. He reasoned that the parties were not contemplating this claim at the time the March 30 agreement was made and so release of such a claim formed no part of the consideration of the March 30 agreement. He therefore held that since this claim was not then being disputed, the March 30 agreement was not an accord and satisfaction and so not a bar to this claim now. As we noted above, the board never explicitly dealt with this issue.

We hold that the March 30 agreement was an accord and satisfaction, as the board found. However, it does not bar the present claim because there is no evidence the parties meant it to bar this claim. We find no evidence in the board's opinion that the parties intended this claim to be barred by the March 30 agreement. Defendant has not shown any. The language of the agreement also does not indicate this claim is to be barred. Defendant asserts that the last sentence does just that. It states: "The agreement will in no way affect contract price or delivery schedule." In this context we do not think that language ap-

plies to the present claim. That language was included to deal with the following problem: plaintiff originally contended that the contract contained no flatness requirement. The Government thought it contained a 7-inch flatness requirement. Hence, the result of the March 30 agreement, imposing a 2½-inch flatness requirement, was that plaintiff felt it would have to perform *more* than the original contract called for and defendant felt plaintiff would have to perform *less*. Therefore, the last sentence was necessary to assure plaintiff that the March 30 agreement would not result in a downward adjustment of the contract price and assure defendant the agreement would not result in an upward adjustment. Hence, we hold that the trial judge was correct in concluding that the present claim is not barred by the March 30 agreement although we do not follow his reasoning that the agreement was not an accord and satisfaction. Rather we hold that it was an accord and satisfaction, but as to claims *other* than the present one.

■ The Government also contends that plaintiff waived its claim by failing specifically to reserve it when the March 30 agreement was made. We find no basis for establishing a waiver on these facts. Much that was said above regarding the accord and satisfaction defense is applicable here. The language of the agreement certainly does not amount to an express waiver of the present claim. As discussed above, the modification agreement applies to other claims entirely. An examination of the negotiations of the parties before entering into the March 30 agreement supports this conclusion. As already mentioned, the board's opinion does not indicate that the parties meant to bar this claim or that they even were considering this claim. Defendant has not shown us any such evidence in the record, nor have we been shown that the Government was in any way prejudiced by the failure to reserve this claim at that time. Hence, we hold there was no waiver of this claim. *Foster Wheeler Corp. v. United States, supra,* 206 Ct.Cl. at 558–59, 513 F.2d at 602. We also note that as in

*Foster Wheeler*, defendant has not pleaded the waiver defense. *Fraass Surgical Mfg. Co. v. United States*, 205 Ct.Cl. 585, 505 F.2d 707 (1974), another government contract case where a waiver was found, is distinguishable. As in this case, there was a supplemental agreement to the contract and the contractor pressed a claim in court which defendant claimed was barred by waiver. Unlike this case, the claim had been considered by the parties prior to the execution of the supplemental agreement which provided compensation to the contractor. The agreement by its own terms was the entire equitable adjustment due the contractor. 205 Ct.Cl. at 593–94, 505 F.2d at 711. Comparable language is absent in this case.

In summary, we hold that the March 30 agreement was an accord and satisfaction but it does not bar the instant claim for excess costs prior to March 30, 1976. Furthermore, plaintiff has not waived its claim. The Government has interposed no other defense. Plaintiff is, therefore, entitled to recover those excess costs, if any, which it expended in attempting to comply with the impossible 7-inch flatness requirement. *Foster Wheeler Corp. v. United States, supra*, 206 Ct.Cl. at 559, 513 F.2d at 602; *Hol-Gar Mfg. Corp. v. United States, supra*, 175 Ct.Cl. at 524, 360 F.2d at 638.

The Government has a counterclaim for the total amount of the progress payments plaintiff received under the contract, since no acceptable magazines were ever delivered. The parties have neither briefed nor argued the counterclaim issues before us. However, we have upheld the board's determination that plaintiff's default was unexcused and the default termination proper. An unexcused default is a breach for which defendant can recover in this court. *Astro-Space Labs., Inc. v. United States*, 200 Ct.Cl. 282, 311–12, 470 F.2d 1003, 1019–20 (1972); *Marley v. United States*, 191 Ct.Cl. 205, 224–25, 423 F.2d 324, 335 (1970). Since plaintiff has asserted no defense to defendant's breach claim, other than the claim we have rejected, that the contract was impossible or commercially impracticable to perform even after it was modified, defendant is entitled to partial summary judgment on its counterclaim on the issue of liability. There remains an uncertainty as to the proper amount of damages. Defendant is claiming only the amount of progress payments it made to plaintiff. The board found that plaintiff received $288,606 in progress payments. However, defendant has claimed only $228,606 in its pleadings. One of the figures undoubtedly contains a typographical error but we cannot tell which. The parties should be able to stipulate the correct amount, but in any event defendant's counterclaim will be remanded to the trial division for a determination of the proper amount.

Plaintiff's motion for summary judgment on its claim is granted in part and denied in part. Defendant's motion for summary judgment on plaintiff's claim is granted in part and denied in part. Plaintiff's claim is remanded to the Armed Services Board of Contract Appeals for further proceedings consistent with this opinion. Proceedings in this court with regard to plaintiff's claim shall be stayed for a period not to exceed 6 months. Plaintiff's attorney is designated to inform this court of the status of proceedings on its claim on remand at intervals of 90 days or less, beginning with the date of this opinion. Ct.Cl. Rules 149, 150. Defendant's motion for summary judgment on its counterclaim is granted as to liability only. The counterclaim is remanded to the trial division for further proceedings to determine the proper amount of the progress payments received by plaintiff. Ct.Cl. Rule 131(c). However, no final judgment will be entered until proceedings on plaintiff's claim are completed. At that point, if plaintiff is entitled to any recovery, the parties' recoveries will be offset against each other and a single final judgment entered.